Filed 1/17/23  P. v. Powell CA3
Review denied 4/12/23; reposted with Supreme Court order and statements.

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C094553 |
| Plaintiff and Respondent, | (Super. Ct. No. 97F07150) |
| v. | |
| NIKITA POWELL, | |
| Defendant and Appellant. | |

In 1998, defendant Nikita Powell pled guilty to first degree murder committed during a robbery.  The trial court sentenced her to an indeterminate term of 25 years to life in state prison.  In 2019, defendant petitioned for resentencing under Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1015).  Following an evidentiary hearing, the trial court denied her petition, finding defendant was a major participant in the robbery and acted with reckless indifference to human life.

1

Defendant appeals from that order. Defendant contends there is insufficient evidence to support the trial court's finding she acted with reckless indifference to human life. We disagree and affirm the order.

## I. BACKGROUND

### A. *Plea and Sentence*

The factual basis for defendant's plea was as follows: "[A]round midnight of September 2nd, maybe the early morning hours of September 3rd, 1997, this defendant and her friend Janet Poole were at an AM/PM market at 47th Avenue and Martin Luther King Boulevard in Sacramento County. And they happened to meet [D.G.], the victim named in the Information. [¶] At that point, there was some discussion and agreement that they would get into [D.G.]'s truck, that they would exchange sexual favors in return for drugs and perhaps for money. [¶] In the course of activities in the sleeper portion of the cab of [D.G.]'s truck, [defendant] left on two occasions with money given to her by [D.G.] to buy drugs. [¶] Upon her return on the second time, she was followed by her boyfriend, [codefendant] James Thomas, who was armed with a handgun. Mr. Thomas immediately demanded money from [D.G.] and put the gun up to his head. A struggle ensued. [¶] Despite the fact that [D.G.] actually tried or said he would give the money to Mr. Thomas, the struggle continued. Mr. Thomas fell out of the truck and when he regained his feet, he just shot and killed [D.G.]. And [defendant] and Mr. Thomas and the other person, Janet Poole[,] fled at that point. [¶] [Defendant] was arrested later that day after she had made a phone call and spoke and described these events to a 911 operator and to a Sheriff's detective."

The trial court subsequently sentenced defendant to an indeterminate term of 25 years to life in state prison.

*B.*     *Petition and Hearing*

In 2019, defendant filed a form petition for resentencing under Penal Code section 1172.6. [1] Defendant's petition alleged that she pled guilty to first or second degree murder because she believed she could be convicted of those offenses pursuant to the felony-murder rule or the natural and probable consequences doctrine. Defendant checked the box stating she could not now be convicted of murder due to the changes made to sections 188 and 189, effective January 1, 2019. Defendant requested appointment of counsel and checked the boxes stating she was not the actual killer, did not act as an accomplice with the intent to kill, and was neither a major participant in the crime nor acted with deliberate indifference to human life.

The trial court appointed counsel for defendant, found defendant established a prima facie showing under section 1172.6, and set the matter for an order to show cause hearing (OSC). At the OSC, the trial court ruled the People would carry the burden "to establish beyond a reasonable doubt the elements of the offense as the law currently exists." The court also ruled it would consider the following evidence: "The opinion from the Third District Court of Appeal from March of 1999, both in [defendant]'s case and Mr. Thomas' case"; the transcript from defendant's sentencing on August 14, 1998; the January 16, 1998 joint preliminary hearing transcript; the April 21, 1998 transcript from defendant's plea entry; the transcript from defendant's motion to withdraw from the plea; and defendant's testimony at Thomas's trial.

In addition, the court considered the August 11, 1998 probation report, the transcripts of defendant's two interviews with the district attorney's office, and Poole's testimony from Thomas's trial. Defendant's sister, C. Holmes, defendant's aunt, T.

---

[1] Further undesignated statutory references are to the Penal Code. Effective June 30, 2022, section 1170.95 was renumbered as section 1172.6 without substantive change. (Stats. 2022, ch. 58, § 10.) We will refer to the section by its new numbering.

Rivera, and Dr. Linda Barnard, an expert in "[i]ntimate partner violence and its effect on the victim," each testified at the OSC.

### 1. Defendant's Interviews with the District Attorney's Office

After pleading guilty to murder, defendant was twice interviewed by the attorney prosecuting Thomas's case. During her first interview, defendant said she was currently being treated with Haldol and Elavil. She was previously diagnosed with paranoid schizophrenia. Defendant said that when she is not taking medications, she hears voices.

Defendant told the prosecutor that for two or three days before D.G.'s murder, she and Poole were using crack cocaine and not sleeping. On the night of the murder, defendant and Poole were going to the store to buy Thomas a beer when they ran into D.G. Defendant knew D.G., who had on prior occasions purchased sex from defendant. That night, defendant and Poole agreed they would give D.G. sex in exchange for drugs and money.

After both women performed a sex act on D.G. in his truck, D.G. gave defendant a $100 bill and asked her to get change. Defendant left and returned with a "boy" who gave them $80 and a rock of cocaine. D.G., Poole, and defendant smoked the crack cocaine and defendant left to get more. This time, defendant ran into Thomas. She bought more drugs and returned to the truck. Defendant told the prosecutor she did not tell Thomas where she was going, but he must have followed her because while D.G. and Poole were engaged in another sex act, and she was smoking the crack cocaine, Thomas opened the truck door. Thomas demanded D.G.'s money. As D.G. reached for his wallet, Thomas began hitting him with a gun. There was a scuffle, and Thomas fell out of the truck. When he stood back up, Thomas shot D.G.

Defendant told the prosecutor that she and Thomas had a history of robbing her customers. Defendant claimed she thought Thomas was using a BB gun because "that's what [they] always used." She said she tried to pull Thomas out of the truck. Defendant denied planning the robbery. Defendant said she did not learn until after the murder

4

where Thomas got the gun. She also said it was Thomas, with another man's help, who disposed of the gun.

When defendant returned for a second interview, she indicated she had been withholding information. This time, she told the prosecutor it was her idea to rob D.G. and told Thomas D.G. had "a lot of money." When defendant ran into Thomas after leaving the truck to buy drugs, she told Thomas she was going to find a person named "Insane" to rob D.G. Defendant knew Insane had a gun; she had committed several robberies with Insane prior to that night. Thomas told defendant there was no need to find Insane; he would commit the robbery if she could help him get a gun. Thomas then directed defendant where to drive so he could get a gun.

Defendant said she never actually saw the gun, but after Thomas acquired the gun, she said: " 'I'm gonna drop you at the field. You can run through the field. By the time I get back in, I will unlock the door. By the time I get back in, then you should just be pullin' up, just coming through.' " Defendant told the prosecutor she and Thomas had already committed about 15 similar robberies, where Thomas used a BB gun. About a week earlier, however, Thomas cut one of their victims with a knife.

Following defendant's plan, Thomas was able to get into the truck where he started hitting D.G. with the gun. Worried the robbery would "be botched," defendant started "pulling [Thomas] to come on." Defendant said that after Thomas shot D.G., they returned to defendant's apartment and Thomas blamed the women for the murder. Defendant told the prosecutor it was never the plan to kill D.G.

2. *Defendant's Testimony at Thomas's Trial*

Testifying for the prosecution, defendant acknowledged Thomas had been her boyfriend for one year at the time of D.G.'s murder. It was her idea to get Insane and have him commit the robbery. Defendant knew from her prior encounters with D.G. that he would have a lot of money with him, and that night he told her he just cashed his

5

paycheck. When defendant told Thomas her plan to recruit Insane, Thomas said he would rob D.G. himself; he just needed a gun.

Defendant drove Thomas to another location. Thomas got out of the car, returning a short time later. Defendant did not see a gun or a knife, but they continued to plan the robbery. They agreed Thomas would go through a field and meet defendant back at D.G.'s truck. Accordingly, 15 minutes after defendant got back to D.G.'s truck, Thomas opened the truck door, pointed the gun at D.G., and demanded D.G. turn over his wallet.

Poole jumped out of the truck and Thomas began to beat D.G. in the head with the gun, continuing to demand D.G.'s wallet. While he was being beaten, D.G. said to Thomas, "I'll get my damn wallet for you. Hold on." But Thomas did not give D.G. a chance to get his wallet; he continued to hit him with the gun.

During the altercation, defendant got out of the truck and began "pulling at" Thomas's pants saying, "come on, let's get out of the truck." The scuffle inside the truck continued until D.G. was able to push Thomas out, causing Thomas to lose his balance. Thomas regained his footing, turned around, and shot D.G.

Immediately after Thomas shot D.G., defendant and Poole got in their car and drove away. Thomas fled the scene on foot. While they were driving to defendant's home, defendant and Poole saw Thomas; they let him in the car. Once they got back to defendant's apartment, Thomas started yelling at the women saying, they "don't know how to set up a robbery." Defendant testified that, at this point, she did not know where the murder weapon was. Defendant, Poole, and Thomas smoked more crack cocaine, after which Poole left, and Thomas and defendant went to bed, but still did not sleep.

The next morning, defendant called her grandmother. Defendant told her grandmother what happened the night before; her grandmother had already seen it on the news. She encouraged defendant to turn herself in. Defendant took her advice.

6

### 3.   *Poole's Testimony at Thomas's Trial*

Poole testified that on the night of the murder, she saw "a stack of money" in D.G.'s wallet.  She said defendant was in a position to see that same stack of money.  Describing the robbery, Poole said Thomas came through the truck door, held a gun to D.G.'s head, and said, "this is a mother fuckin' holdup."  Poole asked, "what are you guys doing."  Thomas told her to "shut the fuck up" and elbowed her; she scrambled out of the truck.  Defendant remained inside, "ransacking [the] truck, trying to find [D.G.'s] wallet."  D.G. and Thomas continued to fight.  Poole begged Thomas not to hurt or kill D.G.  She saw D.G. push Thomas out of the truck, causing Thomas to fall to the ground.  Then she saw Thomas stand up and shoot D.G.

After Thomas shot D.G., Poole remembers Thomas telling her to get in the car and drive; defendant was with them.  Poole got in the driver's seat, defendant and Thomas sat in the back seat, and Poole drove away.  As Poole drove away, she heard defendant tell Thomas to " 'give [her] the gun' " and defendant say, " 'I got to get rid of the gun.' "  Thomas gave defendant the gun.  Defendant got out of the car in the middle of the block and ran "through the building."  Poole parked her car in defendant's garage where it would not be seen, and defendant met them in her apartment.

### 4.   *C. Holmes's OSC Testimony*

Defendant's sister, C. Holmes, testified at the OSC.  Holmes was not there the night of the murder.  She knew nothing about it.  She did, however, know defendant grew up in foster homes and did not grow up in a "stable environment."  Defendant's mother was addicted to crack cocaine and gave defendant her "first hit" of crack cocaine when defendant was 12 years old.

Holmes remembered that in 1997, defendant had three children and was living in an apartment with Thomas.  Defendant was approximately 21 or 22 years old at the time.  Thomas did not have a job.  So, as Holmes understood it, Thomas used defendant to support them and their crack cocaine addiction.  Thomas forced defendant to engage in

7

sex work and to steal. Holmes described seeing Thomas pull defendant down the stairs of their apartment by her hair and men would be waiting at the bottom of the stairs to pay for sex with defendant. Holmes knew Thomas regularly hit defendant. She described Thomas as "mean" and "awful." Holmes assumed defendant stayed with Thomas out of fear, but also because of her drug addiction.

### 5.    *T. Rivera's OSC Testimony*

Defendant's aunt, T. Rivera also testified at the OSC. Rivera confirmed Holmes's testimony that defendant's mother was a drug addict and did not raise defendant. When Rivera first met Thomas, defendant had a black eye and bruising on her face and arms. Thomas and defendant denied any abuse, but Rivera was not convinced.

Despite their denial, Rivera continued to see evidence of abuse on defendant's body. Rivera also heard from other family members that Thomas was abusing defendant. Rivera described "rescuing" defendant from Thomas as an "almost everyday occurrence." She also testified that defendant was engaging in sex work, but Thomas was taking the money.

Rivera had taken defendant from Thomas more than 20 times, but defendant always returned. Rivera repeatedly heard Thomas threaten to kill defendant and to hurt her kids. A day or two before the murder, Rivera remembered seeing Thomas "beating the hell out of" defendant. She insisted defendant leave with her. Defendant told Rivera, " 'No, I'll go with you tomorrow.' " When Rivera went to get her the next day, however, Rivera noted the apartment had been cleared of defendant's belongings. She described the apartment as "ransacked."

### 6.    *Dr. Linda Barnard's OSC Testimony*

Dr. Linda Barnard, an expert in intimate partner violence and its effect on the victim, also testified at the OSC. Dr. Barnard explained that intimate partner violence could cause a victim to experience "anxiety, depression, and fear because of the domestic violence. And the more pervasive that violence is, and the more controlling that the

8

[ab]user is over the victim of that violence, then the less and less that person feels like they have any choices or that they can leave because of fear that's perpetrated by the person who's doing the abuse. So characteristically we see, you know, the effects of that which are trauma, fear, depression, anxiety."

In preparing her report for the OSC, Dr. Barnard reviewed the parties' briefs, "some of the witness statements and declarations by people who were a witness to the abuse that occurred," the report of a doctor who previously assessed defendant, and the probation report. She did not review any police reports and she did not review the transcripts from defendant's interviews with the district attorney's office. Her information relative to the details of Thomas's abuse came from defendant and her family members.

In the documents she reviewed, Dr. Barnard saw evidence that defendant suffered from the effects of intimate partner violence. She read multiple accounts of defendant being "extremely afraid" of Thomas, that he "controlled everything about her." She opined that defendant probably "felt trapped in her situation," and afraid it would be worse if she left. This feeling was consistent with the effects of intimate partner battering.

Dr. Barnard also interviewed defendant twice. She observed defendant had a history of mental health issues, including paranoid schizophrenia and bipolar 2 with depression and anxiety. She noted that a person with mental health issues would be "more vulnerable to the kind of control that someone has in domestic violence." Drug use would exacerbate that vulnerability. This, Dr. Barnard suggested, could be the reason defendant continued to protect Thomas when she was initially questioned by law enforcement. She described this as a "paradoxical attachment," wherein the abused person becomes "unusually attached" to their abuser, an attachment caused by the "cycle of violence."

9

Dr. Barnard also explained that a person who has been involved in a cycle of domestic violence may no longer be able to perceive a situation as "pretty dangerous, or potentially lethal." They would not understand the need to call for help. And, given a hypothetical, Dr. Barnard opined that a victim of domestic violence might rob someone in order to appease their abuser to prevent further abuse. The domestic violence victim may not even appreciate the risks associated with using a loaded firearm to commit that robbery. Dr. Barnard believed defendant was just such a victim.

C.     *Trial Court Ruling*

After the submission of the evidence noted above and briefing, the trial court denied the petition in a 15-page written ruling. The trial court summarized the evidence considered. The trial court also independently reviewed the factors identified in *People v. Banks* (2015) 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) to answer the question of whether defendant was a major participant in the underlying crime and acted with reckless disregard for human life.

On the question of being a major participant, the court found defendant was the "mastermind behind the armed robbery." It was defendant's idea to rob D.G. at gun point, and she helped Thomas acquire the gun. Defendant was not merely a bystander, she was "actively involved in searching for the victim's wallet." And, despite making claims that she pulled at Thomas's clothing while he attacked D.G., the court found "no evidence that [defendant] attempted to step between [D.G. and Thomas] or made other efforts to intervene."

Additionally, the court found defendant made no effort to help D.G. after Thomas shot him. Instead, defendant "left the scene with Poole and Thomas, helped them hide the car, and told them to give her the gun so she could dispose of it." The court concluded defendant was "not a minor actor like a getaway driver, but rather was 'actively involved in every element of the [robbery] and was physically present during the entire sequence of criminal activity' that led to the victim's death."

10

On the question of whether defendant acted with reckless disregard for human life, the trial court considered many of the same findings already considered to determine defendant was a major participant: defendant intended for a gun to be used, she helped procure the gun, she actively participated in the robbery, she made no effort to intervene on D.G.'s behalf, she made no effort to provide aid to D.G. after he was shot, and she helped dispose of the weapon.

The court found it unlikely D.G. was held at gunpoint "for an extended period," but also found defendant knew or should have known Thomas was likely to use lethal force in committing the robbery. Relying on evidence of Thomas's repeated violence against defendant herself, the court found defendant had "first-hand knowledge and experience with Thomas's propensity for violence." Indeed, on the night of the murder, Thomas "punched and choked [defendant] until she could not breathe." Defendant nevertheless helped Thomas acquire a loaded gun to use during the robbery, intentionally increasing the likelihood he would use deadly force. Then she stood by and watched as Thomas repeatedly struck D.G. with the loaded gun. She made no attempt, "either before or during the robbery, to minimize the risks of violence inherent in the armed robbery."

In short, the court concluded, defendant's "familiarity with Thomas's violence against her" was a relevant factual circumstance which, when considered with the other factual circumstances, led the trial court to conclude, beyond a reasonable doubt, that she "exhibited reckless indifference to human life." The court denied her petition accordingly.

## II. DISCUSSION

A.    *Senate Bill No. 1437 and the Section 1172.6 Petition Procedure*

Senate Bill No. 1437 substantially modified the law governing accomplice liability for murder, eliminating the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder (*People v. Gentile* (2020) 10 Cal.5th 830, 842-843 (*Gentile*)) and significantly narrowing the felony-murder exception to the malice

11

requirement for murder. (§§ 188, subd. (a)(3), 189, subd. (e); see *People v. Strong* (2022) 13 Cal.5th 698, 707-708 (*Strong*).) As amended by Senate Bill No. 1437, section 188, subdivision (a)(3), now prohibits imputing malice based solely on an individual's participation in a crime and requires proof of malice to convict a principal of murder, except under the revised felony-murder rule in section 189, subdivision (e). The latter provision requires the People to prove specific facts relating to the defendant's individual culpability: The defendant was the actual killer (§ 189, subd. (e)(1)); the defendant, though not the actual killer, with the intent to kill assisted in the commission of the murder (§ 189, subd. (e)(2)); or the defendant was a major participant in a felony listed in section 189, subdivision (a), and acted with reckless indifference to human life, "as described in subdivision (d) of Section 190.2," the felony-murder special-circumstance provision. (*Strong, supra*, at p. 708; see *Gentile, supra*, at pp. 842-843.)

Senate Bill No. 1437 also authorized, through section 1172.6, an individual convicted of felony murder or murder based on the natural and probable consequences doctrine to petition the sentencing court to vacate the conviction and be resentenced on any remaining counts if he or she could not now be convicted of murder because of the changes in Senate Bill No. 1437 to the definitions of the crime. (See *Strong, supra*, 13 Cal.5th at p. 708.) As the Supreme Court clarified in *People v. Lewis* (2021) 11 Cal.5th 952, and as amendments by Senate Bill No. 775 made explicit, if a section 1172.6 petition contains all the required information, the court must appoint counsel to represent the petitioner if requested. (*Lewis, supra*, at pp. 962-963; see § 1172.6, subd. (b)(1)(A), (3).) The prosecutor must then file a response to the petition, the petitioner may file a reply, and the court must hold a hearing to determine whether the petitioner has made a prima facie showing he or she is entitled to relief. (§ 1172.6, subd. (c).)

Where, as here, the petitioner has made the requisite prima facie showing he or she is entitled to relief under section 1172.6. The court must issue an order to show cause and hold an evidentiary hearing to determine whether to vacate the murder conviction

and resentence the petitioner on any remaining counts. (§ 1172.6, subd. (d)(1).) At that hearing the court may consider evidence "previously admitted at any prior hearing or trial that is admissible under current law," including witness testimony. (§ 1172.6, subd. (d)(3).) The petitioner and the prosecutor may also offer new or additional evidence. (*Ibid.*; see *Gentile, supra*, 10 Cal.5th at pp. 853-854.)

On appeal from an order denying a petition under section 1172.6, we review the trial court's factual findings for substantial evidence. (*People v. Richardson* (2022) 79 Cal.App.5th 1085, 1090; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 985.) We " ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." ' [Citation.] Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*People v. Clements* (2022) 75 Cal.App.5th 276, 298; see *Richardson, supra*, at p. 1090.) " 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 57; *People v. Nieber* (2022) 82 Cal.App.5th 458, 476.)

B.     *Sufficiency of the Evidence*

After the section 1176.2, subdivision (d) hearing, the trial court found, beyond a reasonable doubt, that defendant was a major participant in the underlying felony who acted with reckless disregard for human life. Defendant does not dispute she was a major participant in the robbery of D.G. but argues there is insufficient evidence she acted with reckless indifference to human life. We disagree.

13

*1.      Legal Principles*

"The scope of our review for substantial evidence is well settled.  The test is not whether the People met their burden of proving beyond a reasonable doubt that [defendant] was ineligible for resentencing, but rather 'whether *any* rational trier of fact could have' made the same determination, namely that '[t]he record . . . disclose[s] . . . evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find [as did the superior court].  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the [order] the existence of every fact the [superior court] could reasonably have deduced from the evidence.  [Citation.]  "Conflicts [in the evidence] . . . subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge . . . to determine the . . . truth or falsity of the facts upon which a determination depends." ' " (*People v. Williams* (2020) 57 Cal.App.5th 652, 663.)

"Reckless indifference to human life has a subjective and an objective element. [Citation.]  As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.]  As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' [Citations.]  'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death" ' satisfies the statutory requirement." (*In re Scoggins* (2020) 9 Cal.5th 667, 677.)  To determine whether defendant had the requisite mental state, "[w]e analyze the totality of the circumstances" in a manner that largely overlaps with our "major participant" discussion.  (*Ibid.*)  As our Supreme Court has

14

explained, " '[a]lthough we state these two requirements separately, they often overlap,' " " 'for the greater the defendant's participation in the felony murder, the more likely that he [or she] acted with reckless indifference to human life.' " (*Clark, supra*, 63 Cal.4th at p. 615.)

Our Supreme Court laid out factors to ascertain whether a participant in a crime acted with reckless indifference. These factors include: the defendant's knowledge of weapons and the use and number of weapons in the crime; the defendant's presence at the crime and opportunities to restrain the crime and/or aid the victim; the duration of the felony; the defendant's knowledge of the cohort's likelihood of killing; and the defendant's efforts to minimize the risk of violence during the felony. (*Clark, supra*, 63 Cal.4th at pp. 618-622.)

### 2.    *Analysis*

As mentioned above, defendant challenges only the court's finding that she acted "with reckless indifference to human life." We conclude there is sufficient evidence to support the finding.

Defendant conceived of and planned the robbery. She selected the victim, accepted Thomas's offer to commit the robbery, then helped Thomas secure a gun to use during the robbery. Her role as the "mastermind" behind this armed robbery alone makes it difficult to conclude she did *not* act with reckless indifference to human life. (See *Clark, supra*, 63 Cal.4th at p. 615.) Indeed, in planning the robbery, defendant made no effort to "minimize the risk of violence" during the felony. (*Id.* at p. 622.) On the contrary, she helped Thomas (a person she knew to be violent) procure a loaded gun to use during the robbery. And, given Thomas's history of violence, defendant knew he might use that gun during the robbery. (*Id.* at p. 621.)

But defendant did not just plan the robbery, she participated in it–ransacking D.G.'s truck, looking for his wallet while Thomas beat him with a gun. Given her proximity to the crime, defendant had multiple opportunities to "restrain the crime and

15

aid the victim[]," she did not. (*In re Scoggins, supra*, 9 Cal.5th at p. 678.) Indeed, even after Thomas shot D.G., defendant did not stop to render aid, she fled the scene with Thomas and Poole. Then she disposed of the murder weapon.

We conclude substantial evidence exists to support the finding defendant acted with reckless disregard for human life. The trial court did not err in finding defendant ineligible for resentencing. (§§ 189, subd. (e)(3), 1172.6, subd. (d).)

C.      *Evidence of Intimate Partner Battery*

Defendant argues the trial court failed to *properly* consider evidence of intimate partner battery and its effect on the victim. Defendant does not argue the court failed to consider the evidence, or that she was precluded from presenting evidence. Rather, she contends the court "misapprehend[ed] the purpose of the evidence offered by the defen[dant] at the hearing on the petition." In other words, the court was required to consider this evidence only to support her defense and was precluded from considering it as evidence that defendant knew Thomas to be a violent person. Defendant offers no authority to support her claim and we know of none.

On the contrary, Evidence Code section 1107, subdivision (a) provides evidence of intimate partner battering "is admissible by either the prosecution or the defense regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence." Other than relevance, the only limitation is the evidence cannot be "offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge." (*Ibid.*) Here, the abuser was not on trial and there is no argument the evidence was not relevant. The court simply reached a different conclusion about the evidence than the defendant wanted.

We find no error.

16

## III.  DISPOSITION

The order denying defendant's section 1172.6 petition is affirmed.

/S/

RENNER, Acting P.J.

We concur:

/S/

EARL, J.

/S/

HOCH, J.*

* Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17

Court of Appeal, Third Appellate District - No. C094553

**S278631**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

_____

THE PEOPLE, Plaintiff and Respondent,

v.

NIKITA POWELL, Defendant and Appellant.

_____

The petition for review is denied.


(See Concurring Statements by Justice Groban and Justice Evans.)


_____Guerrero_____
*Chief Justice*


1

PEOPLE v. POWELL

S278631

Concurring Statement by Justice Groban

In 1998, petitioner Nikita Powell pled guilty to first degree murder during the commission of a robbery for her role in a killing committed by her then-boyfriend, James Thomas. In exchange, she was sentenced to 25 years to life.

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Stats. 2018, ch. 1015; Senate Bill 1437) to eliminate natural and probable consequences liability for murder as it applies to aiding and abetting and limit felony murder liability to "major participant[s] in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f); see Pen. Code,[1] §§ 188, subd. (a)(3), 189, subd. (e), as amended by Stats. 2018, ch. 1015, §§ 2, 3.)

Petitioner thereafter filed a section 1170.95[2] petition for resentencing, alleging that she could not now be convicted of murder under the law as amended by Senate Bill 1437. The trial court found that defendant made a prima facie showing for

_____

[1]    Subsequent section numbers refer to the Penal Code unless otherwise specified.

[2]    After petitioner's section 1170.95 petition was resolved by the trial court, section 1170.95 was renumbered as section 1172.6 without any substantive change. (Stats. 2022, ch. 58, § 10 [effective June 30, 2022].) We refer to section 1170.95 for consistency with the trial court's ruling.

1

relief (see former § 1170.95, subd. (c)). At the subsequent hearing (former § 1170.95, subd. (d)), petitioner's sister and aunt testified that the actual killer, Thomas, physically abused petitioner and forced her to engage in prostitution during their relationship. An expert on intimate partner violence testified generally about how intimate partner battery may impact a victim and, more specifically, how a domestic violence victim, like petitioner, might suggest robbing someone to make her abuser happy and avoid being beaten herself.

The trial court denied petitioner's resentencing petition by written order, concluding beyond a reasonable doubt that she could still be convicted of first degree felony murder because she was a major participant in the underlying robbery who acted with reckless indifference to human life. (§ 189, subd. (e); see *People v. Banks* (2015) 61 Cal.4th 788; *People v. Clark* (2016) 63 Cal.4th 522.) The trial court underscored, with extensive citations to the record, that petitioner planned the robbery, she helped Thomas obtain the murder weapon, she was present for the killing, and she did not intervene or render aid to help the victim. The trial court also considered evidence offered by petitioner "in support of a theory that she was a victim of intimate partner violence." The trial court acknowledged petitioner's prior declaration attesting to the fact that Thomas beat "her 'at least twice a week' and that on the night of the murder, Thomas punched and choked her until she could not breathe." The trial court observed that petitioner's aunt and sister "relayed their knowledge of witnessing Thomas violently beating, kicking, and dragging [petitioner] on a regular basis, as well as knowing that Thomas may have been forcing [petitioner] into prostitution on an almost daily basis." The trial court

2

acknowledged that though this evidence was offered in petitioner's defense to "support [] a theory that she was a victim of intimate partner violence . . . [,] it also demonstrate[d] that she knew or reasonably should have known of the danger the armed Thomas posed to the unwitting victim." The trial court found that petitioner's "familiarity with Thomas's violence against her does not establish, by itself, reckless indifference but it is a factual circumstance that this court has considered in weighing the fourth *Clark* factor ["Defendant's Knowledge of Cohort's Likelihood of Killing" (*Clark*, at p. 621)] and finding beyond a reasonable doubt that she knew Thomas was likely to use lethal force." The Court of Appeal affirmed the trial court's ruling, applying the highly deferential substantial evidence standard of review. (*People v. Powell* (Jan. 17, 2023, C094553) [nonpub. opn.].)

Petitioner contends our review is necessary because the People did not present substantial evidence to show she acted with reckless indifference to human life and the trial court erred by ignoring the evidence of intimate partner violence. She further contends that the evidence of Thomas's frequent abuse should have been considered to mitigate her culpability, and not as evidence to affirmatively support a finding that she acted with "reckless indifference to human life." A reviewing court's role "is not to reweigh the evidence" (*People v. Thomas* (2023) 14 Cal.5th 327, 379) and I therefore join my colleagues in voting to deny review. I write separately to highlight that our denial of review should not prevent consideration of petitioner's abuse by Thomas as a potential mitigating circumstance in other contexts, including:

(1) a potential referral for recall and resentencing by the Secretary of the Department of Corrections and Rehabilitation, the Board of Parole Hearings, or the district attorney (see § 1172.1, subd. (a)(1), (4) [when a defendant is referred for recall and resentencing, "[t]he court shall consider if the defendant . . . was a victim of intimate partner violence or human trafficking prior to or at the time of the commission of the offense"]);

(2) at a future parole suitability hearing (see Cal. Code Regs., tit. 15, § 2281, subd. (d)(5) [listing whether "the prisoner suffered from Battered Woman Syndrome" at the time of the offense as a fact tending to show suitability for parole]); or

(3) pursuant to a commutation recommendation (see § 4801, subd. (a) ["The Board of Parole Hearings may report to the Governor, from time to time, the names of any and all persons imprisoned in any state prison who, in its judgment, ought to have a commutation of sentence or be pardoned and set at liberty on account of good conduct, or unusual term of sentence, or any other cause, including evidence of intimate partner battering and its effects"]).

**GROBAN, J.**

**I Concur:**

**LIU, J.**

4

PEOPLE v. POWELL

S278631


Concurring Statement by Justice Evans


Then 21-year-old defendant Nikita Powell pleaded guilty to first degree murder committed during a 1997 robbery in which her boyfriend shot and killed their robbery victim. Prior to the crime, Powell had endured brutal violence — chokings, regular beatings, sex trafficking, threats to her life, and financial abuse — at the hands of her boyfriend, who was more than 20 years her senior. After testifying against her abuser at his trial, the trial court sentenced Powell to 25 years to life.

Since Powell's conviction in 1998, the Legislature has made significant advances regarding the consideration of intimate partner violence evidence in assessing an intimate partner violence victim's culpability in committing an offense and determining the appropriate level of punishment. (See, e.g., Pen. Code, § 1170, subd. (b)(6)(C) [directing courts to impose the lower term where the defendant was a victim of intimate partner violence]; Pen. Code, § 1170, subd. (d)(8)(C) [providing that a court may resentence an individual to a lesser term based on their experience as a victim of intimate partner violence]; Pen. Code, § 1172.1, subd. (a)(4) [directing courts, in evaluating whether to recall a sentence, to consider whether intimate partner violence was a "contributing factor" in the defendant's commission of the offense].) These measures reflect the general recognition that experiencing intimate partner violence can

1

often *diminish* one's culpability in committing an offense or is otherwise a mitigating circumstance warranting mercy.

In enacting Senate Bill No. 1437 (Reg. Sess. 2017–2018; Senate Bill 1437) in 2018, the Legislature received materials that addressed how victims of intimate partner violence are often unjustly convicted of crimes committed by their abusers. (See, e.g., Fátima Avellán, Survived and Punished, letter to Sen. Nancy Skinner, Apr. 16, 2018, p. 1 ["A legal doctrine that holds a person responsible for the violent actions of another will disproportionately impact victims of intimate partner violence. . . . Because this legal doctrine has been used to punish survivors for the violent acts of their abusive partners, survivors are often subjected to life and life without parole sentences as a consequence of being trapped in conditions of intimate partner violence"]; Cal. Chapter of Nat. Assn. of Social Workers, Women's Council, letter to Sen. Nancy Skinner, Apr. 16, 2018, p. 1 ["a number of women [are] serving life sentences as a result of actions taken by a husband or boy friend [*sic*]. Some, who were survivors of domestic violence by their male partner, explained their presence at the scene of the crime was at the instance of the abusing partners. Others, [*sic*] reported that they were unaware that the person they were with, [*sic*] had brought a deadly weapon to the scene. Many were quite young at the time of the crime"]; Maureen Washburn, Center on Juvenile and Crim. Justice, letter to Sen. Nancy Skinner, Apr. 6, 2018, p. 1 ["approximately 70 percent of women charged with homicide were accomplices, not the actual perpetrators of the act that led to death. These women are often in coercive relationships with the perpetrators"].) Individuals and organizations supporting Senate Bill 1437 specifically

2

highlighted that murder liability should not be imputed onto victims of intimate partner violence, such as Powell, based on the actions of their abusers — and they understood Senate Bill 1437 as serving, in part, to correct that issue.

It is against this backdrop that Powell petitioned in 2019 for resentencing relief pursuant to Senate Bill 1437. (Pen. Code, § 1172.6.) At an evidentiary hearing on her petition for resentencing, Powell presented extensive evidence regarding the intimate partner violence she experienced at the hands of her cohort — the actual killer — as well as expert testimony regarding the effects of intimate partner violence. As to how intimate partner violence factored into her participation in the offense, an expert testified that "a person who has been involved in a cycle of domestic violence may no longer be able to perceive a situation as 'pretty dangerous, or potentially lethal,' " that "a victim of domestic violence might rob someone in order to appease their abuser to prevent further abuse," and that "[t]he domestic violence victim may not even appreciate the risks associated with using a loaded firearm to commit that robbery." (*People v. Powell* (Jan. 17, 2023, C094553) [nonpub. opn.].)

In denying her petition for resentencing relief, the trial court found beyond a reasonable doubt that Powell was a major participant in the underlying robbery who acted with reckless indifference for human life. In evaluating the *Clark* factors for determining reckless indifference to human life (*People v. Clark* (2016) 63 Cal.4th 522, 617 (*Clark*)), the trial court concluded the evidence of Powell experiencing intimate partner violence — specifically, her knowing "first-hand" of her cohort's propensity for violence — *supported* a finding of reckless indifference to human life. (See *Clark*, at p. 621 ["A defendant's knowledge of

factors bearing on a cohort's likelihood of killing are significant to the analysis of reckless indifference to human life"].) The court made no express findings regarding the expert's testimony that intimate partner violence could have diminished Powell's ability to perceive the situation as lethally dangerous. There is also no indication the trial court accounted for Powell's youthful age or the fact that she was a victim of human trafficking.

I disagree that intimate partner violence evidence should be used to show that a victim of intimate partner violence knew of their cohort's propensity to use lethal violence based on their personal experience of being abused. (See *Clark*, *supra*, 63 Cal.4th at p. 621.) In this case, the trial court's only direct evaluation of the intimate partner violence evidence appears to be a conclusion that because Powell suffered near-lethal harm at the hands of her cohort, she knew of the likelihood that he would kill their robbery victim. Notably, the trial court's consideration of the intimate partner violence evidence in this manner contradicted the expert's testimony as to the effects of intimate partner violence on victims. The trial court's treatment of intimate partner violence evidence — which, again, is generally understood as a *mitigating* circumstance — to increase an intimate partner violence victim's culpability is not an anomaly. (See, e.g., *In re Harper* (2022) 76 Cal.App.5th 450, 461 [highlighting that "petitioner had personal experience with [his cohort's] violent tendencies, having been the victim of [his] beatings" in evaluating the *Clark* factors].) As the Court of Appeal here noted, Evidence Code section 1107, relating to the admissibility of expert testimony on intimate partner violence, does not expressly contain any such guardrails precluding

4

consideration of intimate partner violence evidence in this manner.

Because it is unclear how much weight the instant trial court gave to its consideration of the intimate partner violence evidence in supporting its finding of reckless indifference, and given the deferential standard of review on appeal, I do not vote to grant review. However, there are several mechanisms — such as a recall of sentence (Pen. Code, § 1172.1, subd. (a)(4)) and parole suitability consideration (Cal. Code Regs., tit. 15, § 2281, subd. (d)(5) [listing "Battered Woman Syndrome" as a circumstance indicating suitability for parole]) — that may serve to give just consideration to Powell's experience as a victim of intimate partner violence, as well as her youthful age and her experience as a victim of human trafficking. In any event, there remains a need for additional guidance on this issue — if not from the courts, from the Legislature.

**EVANS, J.**

**I Concur:**

**LIU, J.**

5